Gerald M. HYDE, Jr., Plaintiff-Appellee Cross-Appellant,

and

Employers National Insurance Company, Intervenor-Appellee,

v.

CHEVRON U.S.A., INC., Defendant-Appellant Cross-Appellee,

v.

POOL OFFSHORE and Jeremy Hew Phillips, Third Party Defendants-Appellees.

No. 81–3200.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1983.

Lloyd C. Melancon, New Orleans, La., for Chevron U.S.A., Inc.

John D. Schoonenberg, Houma, La., for Hyde.

Ronald A. Johnson, New Orleans, La., for Pool Offshore.

Patrick E. O'Keefe, Richard A. Sabalot, New Orleans, La., for Employers Nat. Ins. Co. (intervenor).

Before BROWN, WISDOM and RANDALL, Circuit Judges.

WISDOM, Circuit Judge:

This diversity action is controlled by Louisiana law. The core of this appeal is the district court's imposition of strict liability on Chevron U.S.A., Inc. (Chevron), owner of an offshore drilling platform, for injuries sustained by Gerald Hyde, an oil worker employed by the drilling contractor, Pool Offshore Company (Pool). Hyde was injured in an accident on the platform. The district court held that the accident was caused by the "failure" of the last step of a staircase on the platform "in combination with another cause (plaintiff's initial slip)". The trial court, sitting without a jury, found, using the language of article 2322 of the Louisiana Civil Code, that the injury was "occasioned" by the "ruin" of a building, for which Chevron was strictly liable. *Hyde v. Chevron U.S.A., Inc.,* E.D.La.1981, 514 F.Supp. 740. The court also held that an indemnity agreement Chevron had with its drilling contractor should not be construed to require Pool to indemnify Chevron. Chevron appeals from both of these rulings and Hyde cross-appeals from the allegedly insufficient award of damages. We affirm in part, reverse in part, and remand the case to the district court.

## I.

On September 16, 1976, Chevron and Pool entered into an agreement for Pool to perform workover operations on certain Chevron oil wells located in the Gulf of Mexico. Under the agreement, Pool was to use one of its rigs on a Chevron offshore platform and furnish all crews, labor, equipment, and supplies in placing the rig on the platform and in conducting its drilling operations. Paragraph 7 of the agreement provided that Pool "shall be responsible for, and shall defend, indemnify and hold [Chevron] harmless from and against, any claims for damages for loss or destruction of property of [Pool], or for injury to, impairment of health of, or death of employees of [Pool] . . . that may arise from [Pool]'s operations under this agreement." Paragraph 8 provided that Pool "agrees that all of its operations . . . are those of an independent contractor and that it is not, and none of its employees, are, an employee" of Chevron.

In accordance with the agreement, Pool moved its Workover Rig No. 2 onto one of Chevron's offshore platforms, permanently attached to the floor of the Gulf of Mexico. Pool Rig No. 2 consisted of a drilling rig, mud pumps, draw works, living quarters, and galley. Because of lack of space on the platform the living quarters were placed on top of the galley instead of being placed in the usual position on a side of the galley. Pool brought in one of its metal staircases from another location to enable the crew to go to and from the rig's living quarters. The staircase was welded to the living quar-

ters at the top and to the main deck at the bottom. It was necessary, however, to weld an additional step to the staircase. Pool's subcontractor performed the welding work.[1] The district court found that the staircase was unusually steep.

On May 10, 1977, the first day on the job, Hyde, a derrickman and relief driller, was descending the stairs in a drizzling rain when he slipped on the third step from the bottom of the staircase. When his feet reached the last step it gave way and Hyde landed on the deck on his lower back and buttocks. As a result of the accident, Hyde underwent surgery on three occasions and experienced severe pain and suffering.

Hyde filed suit against Chevron alleging negligence under article 2315[2] and strict liability under article 2322 of the Louisiana Civil Code. Chevron filed a third party complaint against Pool and Pool's insurer, Underwriters at Lloyd's, London, seeking indemnity under the terms of the workover agreement. Employer's National Insurance Co., the compensation insurer for Pool, intervened to recover compensation payments paid to Hyde.

The trial court made no finding with regard to negligence under article 2315, but found Chevron strictly liable under article 2322 for Hyde's injuries and awarded $218,920.23 in damages.[3] Of this amount, the court attributed $45,000 to past and future pain and suffering, $50,765.43 to loss of past wages, $100,000 to future lost wages, and $23,155.40 to medical expenses. The trial court denied Chevron's third-party indemnity demand against Pool and Pool's insurer.

Chevron attacks both holdings of the trial court. As to strict liability, Chevron argues that the court erred in finding that the broken step rendered the staircase/platform a "ruin" as required by article 2322. Alternatively, Chevron argues that the step was not the cause of Hyde's injuries and that, even if it was, Pool's or Hyde's concurrent negligence bars Hyde's recovery under article 2322. Finally, Chevron contends that the indemnity clause of the work-over agreement requires a finding in its favor on the indemnity issue. Hyde filed a cross-appeal questioning the adequacy of the damages awarded.

## II.

The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1343 (1976 & Supp. III, 1979), mandates that state (here Louisiana) law be applied to fixed offshore structures such as the platform involved in this case. *Rodrigue v. Aetna Casualty & Surety Co.*, 1969, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360. Federal courts, therefore, have had to confront difficult questions concerning the interpretation of state law as it applies to personal injuries on offshore drilling platforms. The difficulty is compounded by the uniqueness of the Louisiana law of strict liability for accidents caused by "defective" things. It is not "strict liability" as it is found in the common law or in the Restatement (Second) of Torts § 402A (1965), although the Louisiana doctrine as articulated in many of the key opinions smacks of the Restatement and, indeed, § 402A is often cited. To make matters worse, the Louisiana cases in this field, no less than the federal cases, are not distinguished for their consistency.

Article 2317 of the Louisiana Civil Code defines strict liability. Until the Louisiana Supreme Court decided *Loescher v. Parr*, La.1975, 324 So.2d 441, courts regarded the article as transitional rather than having substantive force of its own subjecting a custodian to strict liability. Articles 2318–2322 provide specific instances in which a person may be held liable for damage

---

1. The sub-contractor, Wemac Welders, Inc., was not made a party to this suit. The parties later stipulated that Jeremy Hew Phillips should be substituted as third-party defendant in place of Underwriters at Lloyd's, London.

2. Article 2315, the fountainhead of tort law in Louisiana, in pertinent part, reads as follows:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

3. The trial court also awarded damages of $57,290.02 to Pool's compensation insurer. This award has not been challenged on appeal.

caused by a person or thing in his custody. These articles and Article 2317 are substantially identical with their antecedents in the Louisiana Codes of 1870, 1825, and 1808 and the Code Napoleon. Article 2317 provides:

> We are responsible, not only for the damage occasioned by our act, but for that which is caused by the act of persons for whom we are answerable, or of things which we have in our custody. This, however, is to be understood with the following modifications.

The modification controlling this action is article 2322. This article provides:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.

No inference of a requirement of the owner's negligence or culpability should be drawn from the word "neglect". The history of Article 2322 demonstrates beyond doubt that the word is a synonym for "failure", whether or not caused by negligence.[4] The article departs "from the normal standard of delictual responsibility by predicating liability upon the existence of particular fact situations instead of upon 'fault' of the person held responsible.[5] In short, nothing prevents an unequivocal declaration that article 2322 establishes a rule of strict liability or liability without fault." Comment, Article 2322 and the Liability of an Immovable, 42 Tul.L.Rev. 179 (1967).[6]

---

4. Article 2322 is derived from Article 1386 of the Code of Napoleon through article 22, section 11, Title IV of the Civil Code of 1808 and article 2302 of the Civil Code of 1825. The French text of the Louisiana articles is identical with the text of art. 1386: "La propriétairé d'un bâtiment est responsible du dommage causé par sa ruine, lorsqu'elle est arrivée par une suite du *défaut d'entretain* (failure to maintain) ou par le vice de sa construction". In the English version, the phrase "defaut d'entretain" was rendered as "negligent to repair". The French text "thus frees article 2322 from the overtones of culpability implicit in the word 'neglect' and thereby lends support to a strict liability interpretation of the text". Comment, Article 2322 and the Liability of the Owner of an Immovable, 42 Tul.L.R. 178 (1967). The French text prevails over the English translation in construing the Codes of 1808 and 1825, and would prevail today. *Phelps v. Reinach,* La. 1886, 38 La.Ann. 547; Dubuisson, The Codes of Louisiana (Originals Written in French; Errors of Translation), 25 Proc. of La. Bar Assn. 143 (1924); *Shelp v. National Surety Corp.,* 5 Cir.1964, 333 F.2d 431. We have eschewed discussion of the French authorities, because they are discussed at length in *Loescher v. Parr,* La. 1975, 324 So.2d 441.

5. There is a large body of writings on the concept of fault in civil law and tort doctrine in Louisiana. *See Grigsby v. Coastal Marine Service,* 5 Cir.1969, 412 F.2d 1011, 1025 n. 31; *Williams v. Employers Liability Assurance Corp.,* 5 Cir.1961, 296 F.2d 569, 570 n. 1. Professor Wex Malone, in a recent article, Ruminations on Liability for the Acts of Things, 42 La.L.Rev. 579, 580 n. 5, cited the following writings:

> *See, e.g.,* 2 H. Mazeaud & A. Tunc, Traite Theorique et Pratique de la Responsibilite Civile Delictuell et Contractuelle nos. 1138–

1328 (6th ed 1970); Stone, *Tort Doctrine in Louisiana: The Concept of Fault,* 27 Tul.L. Rev. 1 (1952); Tunc, *The Twentieth Centry Development and Function of the Law of Torts in France,* 14 Int'l & Comp.L.Q. 1089 (1965); Tunc, *Louisiana Tort Law at the Crossroads,* 48 Tul.L.Rev. 1111 (1974); Comment, *Fault of the Victim: The Limits of Liability under Civil Code Articles 2317, 2318, and 2321,* 38 La.L.Rev. 995 (1978). *See also* Verlander, *Article 2317 Liability: An Analysis of Louisiana Jurisprudence Since Loescher v. Parr,* 25 Loy.L.Rev. 263 (1979); Comment, *Does Louisiana Really Have Strict Liability under Civil Code Articles 2317, 2318, 2321?,* 40 La.L.Rev. 207 (1979); Comment, *Tort Law in Louisiana—The Supplementary Tort Articles 2317–2322,* 44 Tul.L. Rev. 119 (1969); Note, *A Functional Purpose for Comparing Faults: A Suggestion for Re-examining "Strict Liability,"* 41 La.L.Rev. 1374 (1981); Note, *Olsen v. Shell Oil: Expanded Liability for Offshore Oil Platform Owners,* 40 La.L.Rev. 233 (1979); Note, *The "Discovery" of Article 2317,* 37 La.L.Rev. 234 (1976).

6. But: "[to] the extent that *Loescher* prevents a defendant from alleging due care in response to a plaintiff's action Louisiana does have strict liability under articles 2317, 2318, and 2321. However, to the extent that *Loescher* requires a determination that the risk created by the thing is unreasonable, thus forcing the court to balance the utility of the thing against the magnitude and probability of the risk created by it, a part of negligence theory is still alive in this area". Poole, Does Louisiana Really Have Strict Liability Under Civil Code Articles, 40 La.L.Rev. 207, 219 (1979).

Notwithstanding the application of the term "strict liability"[7] to articles 2317 and 2322, under both articles the liability of the owner of a thing (article 2317) or "building (article 2322) is not absolute". Gaudet, The Application of Louisiana's Strict Liability Law on the Outer Continental Shelf: A Quandary for Federal Courts, 28 Loyola L.Rev. 101, 116 (1982). The owner is absolved from liability by three defenses: (1) the fault of the victim; (2) the fault of some third party (who must be a "stranger" rather than a person acting with the consent of the owner); and (3) an irresistible force. *Loescher v. Parr,* La.1975, 324 So.2d 442. *Loescher,* now regarded as the seminal decision for the current Louisiana doctrine of fault under 2317 and 2322[8] and analogous articles, has added the "unique requirement"[9] that the injurious thing must be shown to be "defective". Judge, then Justice, Tate, speaking for the Louisiana Supreme Court, stated:

> When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the [owner's] part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect

creates an unreasonable risk of injuries to others.[10]

324 So.2d at 446.

Professor Wex S. Malone, widely respected authority on torts, capsulates the Louisiana doctrine as "unqualified liability for the acts of defective things."[11]

In *Jones v. City of Baton Rouge,* 388 So.2d 737, 739 (La.1980), the Louisiana Supreme Court further explained the "unreasonable risk of injury" language:

> Because the responsibility for preventing the unreasonable risk of injury to others is unconditional, the injured party seeking damages under article 2317 need not prove that any particular act or omission on the part of the defendant caused his injuries. He must only prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect—that is, that it occasioned an unreasonable risk of injury to another—and that his injury was caused by the defect.

### III.

Chevron concedes that a drilling platform permanently attached to the floor of the Gulf of Mexico is, under Louisiana law, a building.[12] We agree, too, with the district court that the staircase was an appurtenance of the platform, the "ruin" of which subjects the owner to strict liability under article 2322.

---

7. "The legal fault thus arising from our code provisions [articles 2317–2322] has sometimes been referred to as strict liability". *Loescher v. Parr,* 324 So.2d 441, 447 (La.1975).

8. "The legal fault of an owner under Article 2322 is similar to the legal fault of the owner or guardian under Article 2317". Gaudet, The Application of Louisiana Strict Liability Law on the Outer Continental Shelf: A Quandary for Federal Courts, 28 Loy.L.J. 101, 106.

9. Professor Malone's words. Malone at 994 n. 5.

10. Continuing, the court explained:
 The *fault* of the person thus liable is based upon his failure to prevent the person or thing from whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship

(custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon *his obligation to guard against the condition or activity* (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others.
324 So.2d at 446.

11. Malone at 993 n. 5.

12. *Moczygemba v. Danos & Curole Marine Contractors,* 5 Cir.1977, 561 F.2d 1149, 1151; *McIlwain v. Placid Oil Co.,* 5 Cir., 472 F.2d 248, 250, *cert. denied,* 1973, 412 U.S. 923, 93 S.Ct. 2734, 37 L.Ed.2d 150; *Olsen v. Shell Oil Co.,* La.1979, 365 So.2d 1285, 1290.

"The Courts of Louisiana have interpreted Article 2322 broadly as encompassing necessary appurtenances to structures and to movables made immovable by attachment." *Moczygemba v. Danos & Curole Marine Contractors*, 5 Cir.1977, 561 F.2d 1149, 1151. In that case we held that a crane welded to the deck of a drilling platform and used in ongoing operations was an appurtenance to the platform. In *Olsen v. Shell Oil Co.*, 5 Cir.1977, 561 F.2d 1178, this Court certified to the Louisiana Supreme Court the question whether the word "ruin" as used in article 2322 applied in a case where injuries and deaths were caused by the explosion of a hot water heater on a drilling platform. The Louisiana Supreme Court, again in an opinion by Justice Tate, responded that it did apply. Article 2322 establishes a "nondelegable duty" on the owner of a building "to keep his buildings and its appurtenances in repair so as to avoid unreasonable risk of injury to others, and [the owner] is strictly liable for injuries to others resulting from his failure to perform this duty imposed by law upon him." *Olsen v. Shell Oil Company*, 365 So.2d 1285, 1292 (La.1979). In *Champagne v. Chevron*, 5 Cir.1979, 605 F.2d 934, this Court, relying on *Olsen*, held that a defective nozzle on a fire hose used on a drilling platform is "no less an appurtenance than a window fan, or water heater, or electric wiring." 605 F.2d at 936. This reasoning is applicable with greater force to a metal staircase welded to a drilling platform and necessary for the ongoing operations of the crew.[13]

The staircase was a substantial appurtenance of the platform, but the question remains whether the staircase/platform was a ruin. The district court held:

Chevron's inability to keep the staircase in good repair and plaintiff's injury were a direct result of a defective condition in the staircase, whether the defect was due to a defect in the original design or in the manufacture (or, as here, the modification of the staircase), or through a neglect to repair it. This Court finds that plaintiff has proven a "ruin" by a preponderance of the evidence and, therefore, Chevron's liability to plaintiff extends to damages resulting from the defect in this appurtenance, *Champagne v. Chevron, U.S.A., Inc.*, 605 F.2d 934 (5th Cir.1979); *Olsen v. Shell Oil Co., supra*. This is true even though Pool may remain the owner of the staircase as between Pool and Chevron. *Olsen v. Shell Oil Co., supra* at 1290.

514 F.Supp. at 744.

■ Chevron would have us hold that there was no ruin; that the district court erred in the light of our holding in *Mott v. ODECO*, 5 Cir.1978, 577 F.2d 273, *cert. denied sub nom. Ocean Drilling and Exploration Co. v. Quality Equipment, Inc.*, 1979, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461. In *Mott* we held that a ladder with a missing rung did not constitute a ruin. In that case, however, there was no proof of a "fall or collapse" of a substantial component of a building; the "ladder, though defective, remained intact, upright, and fixed in position". *Id.* 577 F.2d at 276. Here, as the district court held, the staircase may have remained standing, but the last step gave way when Hyde's feet struck that step.

In its brief on appeal Chevron refers to the last step as "bent" and "slightly bending". This description falls short of the facts. The trial court stated in its findings that the last step in the stair case "separated from its support on one side" and "collapsed". The record shows substantial evidence in support of the court's finding. The plaintiff testified that the step separated from the beam. James Johnson, an eye witness to the accident, testified that the angle-iron holding the step to the beam "gave way". Melville Galloway, the welder crane operator who repaired the step, stated that the bottom step "bent over and

---

**13.** *Accord McIlwain v. Placid Oil Co.*, 5 Cir., 472 F.2d 248, *cert. denied,* 1973, 412 U.S. 923, 93 S.Ct. 2734, 37 L.Ed.2d 150. In *McIlwain*, we allowed the plaintiff to recover under Article 2322 after he "unexpectedly plummeted into the Gulf of Mexico and was seriously injured when a section of the grated deck of an offshore drilling platform upon which he was working gave way beneath his feet." *Id.* at 249.

broke loose on one side . . . [w]hoever fixed the step, the piece of iron was too short on the side and it let the grating hang way over and when his weight or whatever hit the step, his weight or whatever it was went on the edge of the grate, it bent, pulling the angle iron loose". Johnny Fred Whiddon, Galloway's helper, testified that the end of the step separated from the beam. The testimony of the plaintiff as well as the testimony of Dr. William Marmande, M.D. established that the plaintiff weighed one hundred fifty-five pounds at the time of the accident. A mechanical engineer testified that a small one-quarter inch weld would have been sufficient to hold the plaintiff's weight and that a one-quarter inch weld one inch long would have successfully resisted a sheer force of 2,400 pounds.

■ We conclude that the district court did not err in finding that the defective condition of the step at the time of the injury rendered the staircase/platform a "ruin" within the meaning of article 2322. The effect of that finding was to compel the holding, with which we agree, that Chevron was strictly liable to Hyde, absent a defense. That finding has another effect, not considered by the district court, relating to causation and to policy considerations in the indemnity issue. It required a holding that Pool's negligence was a substantial cause of the accident, notwithstanding the trial court's unexplained statement that "there is no evidence that the staircase failed due to any improper handling or misuse by Pool." *See* Section VII of this opinion. Taking the words at their face value, that statement is clearly erroneous; the staircase became a ruin because of Pool's negligent welding.

## IV.

An essential element of a viable action under § 2322 is that the "ruin" of the building caused the plaintiff's injury. *Rodrigue v. Dixilyn Corp.,* 5 Cir.1980, 620 F.2d 537, 541–42, cert. denied, 1981, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842; *Loescher v. Parr,* La.1975, 324 So.2d 441, 444–45. Chevron contends that the plaintiff caused the injury when he slipped two steps above the last step. The trial court ruled that although the defective condition of the last step was not the sole cause of Hyde's injury (the plaintiff's slip on the stairs was a contributory cause), the failure of the last step directly produced or contributed substantially to produce the damage. Except for the failure of the last step, the injury or damage would not have occurred.[14] We have no reason to disagree with this finding. The effect, however, of contributory negligence, a form of "victim fault" will be considered in the next section of this opinion.

## V.

The district court, speaking categorically and *apparently* well supported by authority, held:

> Under Louisiana law, the contributory negligence of the plaintiff is not a defense to an action predicated on strict liability. Chevron will only be relieved of its liability if the plaintiff, who with full knowledge and appreciation of the danger, voluntarily exposed himself to the risks and embraces the danger. *Rodrigue v. Dixilyn Corp.,* 620 F.2d 537 (5th Cir. 1980).

514 F.Supp. at 744.

In *Rodrigue,* the case relied on by the district court, Judge Tate, distinguished and

---

**14.** The trial court found:

The evidence in this case supports the conclusion that the plaintiff slipped and fell on the stairway while descending between the living quarters and the main deck. As plaintiff began his fall, his feet struck the bottom step, which gave way upon impact. It is true that the failure of the last step was not the sole cause of the damage, but the evidence supports the proposition that its failure directly, and in natural and continuous sequence, produced, or contributed substantially to produce, the damage. It can reasonably be said that, except for the failure of the last step, the injury or damage would not have occurred. It is clear that the failure of the last step operated in combination with another cause (plaintiff's initial slip) that occurred at essentially the same time and as part of the same event, and that such failure contributed substantially to producing the damage. 514 F.Supp. 744.

ubiquitous in the field of Louisiana strict liability, after a thorough review of the law in Louisiana and in other jurisdictions, concluded that "a strict liability action is not barred by the conduct of the plaintiff which amounts to no more than contributory negligence", 620 F.2d at 544; that is, it is not such victim fault as to relieve the owner-custodian of liability under article 2322.[15] The Court relied on the Louisiana Supreme Court in *Langlois v. Allied Chemical Corp., Inc.,* 1971, 258 La. 1067, 249 So.2d 133, 140, for "authoritative guidance": "The defense of contributory negligence which is urged here presupposes original negligence on the part of the defendant. This [strict liability] case is not a case where negligence is an ingredient of fault, and contributory negligence is not a defense". *See also Alford v. Pool Offshore Co.,* 5 Cir.1981, 661 F.2d 43.[16]

A very recent Louisiana Supreme Court case, however, one not cited by the district court and decided subsequent to *Rodrigue,* leads us to conclude that the conceptual difficulties inherent in the "victim-fault" defense to strict liability under articles 2317 and 2322 make it impossible now to assert categorically, as the district court did, that "contributory negligence is not a defense". In *Dorry v. Lafleur,* 399 So.2d 559 (La. 1981), an ice skater at a commercial rink slipped in a small puddle of water caused by rain water leaking through a defective roof.

The Louisiana Supreme Court stated: "The threshold issue posed by this appeal, therefore, is whether the 'victim-fault' identification in *Loescher v. Parr* as a defense in a strict liability case, may include *ordinary* contributory negligence". (Emphasis added.) The Court held that contributory negligence was a defense: "Where a plaintiff's negligence contributes to his own damage, there is no reason to ignore his fault in every case simply because the defendant's liability is based on some legal fault other than negligence. Quite to the contrary, the plaintiff's negligence should carry more, not less, consequence when the defendant is strictly liable, but less culpable than the plaintiff." 399 So.2d at 560. The Court distinguished *Langlois,* noting that although the rejection of contributory negligence was correct in that case, which involved an extrahazardous activity, the *Langlois* holding that contributory negligence may never be a defense to a strict liability claim was "overbroad".

The Court then gave examples of certain situations in which contributory negligence would be a defense to strict liability: where strict liability is found in circumstances which are "neither extrahazardous nor unnatural to the locality, and produce[s] no income to the defendant". 399 So. at 561. The Court considered that "[u]nder what

---

**15.** Judge Tate stated:

> In *Loescher* and *Olsen* the Louisiana court did not have occasion to address the issue of the third defense to strict liability under the Civil Code—i.e., the fault of the victim (here at issue). However, to be consistent with the stated criteria of the other two defenses, the victim's fault should be in the nature of an independent and superseding cause of his damages not imputable to the defendant, in order to absolve a defendant of its responsibility for damages caused by the defect of a thing for which he is strictly liable.
>
> 620 F.2d at 542.

**16.** In *Alford* this Court concluded that contributory negligence is not a defense to strict liability under article 2322. The Court cited *Rodrigue* and *Langlois,* but did not refer to *Dorry.* The Court followed *Moczygemba v. Danos & Curole Marine Contractors, Inc.,* 5 Cir.1977, 561 F.2d 1149 in its discussion of article 2322, but made no reference to the *Moczygemba* court's conclusion that "under Louisiana law,

any form of contributory negligence is an absolute bar to an action under Article 2322". *Id.* at 1153 n. 8.

In *Oliver v. Aminoil, USA, Inc.,* 5 Cir.1981, 662 F.2d 349, decided fourteen days after the *Alford* case, this Court followed *Moczygemba* and held that the defense of "victim fault" "includes contributory negligence of the victim". The victim's conduct would have to be described as ordinary contributory negligence, not assumption of risk. In a very recent case, *Branch v. Chevron Intern. Oil Co., Inc.,* 5 Cir. 1982, 681 F.2d 426, 431, involving a claim of liability for negligence under article 2315 and also a claim of strict liability under articles 2317 and 2322 for injuries caused by a defect in a drilling platform, the court did not address the question of contributory negligence as a defense to strict liability. The court characterized the issue, however, "as a difficult and unsettled question of Louisiana law, see *Dorry v. Lafleur...." Id.* at 431, n. 6.

circumstances a plaintiff's contributory negligence should bar his recovery in a strict liability case should be developed on a case by case basis". *Id.* The Court held that in *Dorry* the plaintiff's contributory negligence was not a defense because the "ruined" building, the skating rink, was a "commercial enterprise to which plaintiff has paid the price of admission".[17]

*Dorry* was a plurality decision, and the author of the opinion was an ad hoc justice. But after a case-by-case review of the opinions in which *Dorry* has been relied on or distinguished by the intermediate courts of appeal which have had to develop the doctrine of victim fault, as a defense in strict liability cases, we are impressed with the acceptance of the *Dorry* holding that contributory negligence is victim fault.

Perhaps the most clearly articulated reasoning supporting the view that contributory negligence is a defense in strict liability cases is found in a pre-*Dorry* case, *Sullivan v. Gulf States Utilities*, 382 So.2d 184 (La. App. 1st Cir.1980), *writ denied*, 384 So.2d 447 (La.1980). The *Sullivan* court directly identified "victim fault" as encompassing contributory negligence. The court first discussed *Olsen:*

> *Olsen* dealt solely with the fault of the third person necessary to exonerate a defendant of liability under the strict liability provision of Article 2322, dealing with the ruination of a building. We do not think third party fault can be analogized to victim fault for purposes of strict liability. The supreme court in *Olsen* made no indication that it was speaking of victim fault when it held that third party fault must be the sole cause of an accident in order to relieve an owner of liability for the ruin of his building. If anything, victim fault is more closely analo-

gous to contributory negligence than it is to third party fault under the strict liability articles, especially as third party fault has been understood in the wake of *Olsen.*

The court then considered *Loescher:*

> It would be ironic in this case for the defendant to be able to escape liability in a negligence action because of the plaintiff's contributory negligence, yet be held liable under a strict liability theory when the plaintiff has been equally at fault in bringing about the harm. We think the policy reasons underlying *Loescher v. Parr* point away from such an ironic result. *Loescher* was based on the proposition that, out of two innocent parties, the owner or guardian of a thing should pay for any damage caused by that thing. We do not have two innocent parties in this case, as the word innocent is understood in strict liability law. For purposes of this case, we think the measure of conduct necessary to achieve the appellation "contributory negligence" is the same measure necessary to amount to "victim fault" under Article 2317.

We consider it useful to review all the post-*Dorry* decisions in the Louisiana courts of appeal we have found because they reflect the Louisiana appellate judges' understanding of *Dorry.*

In *Wilkinson v. Hartford Accident and Indemnity Co.*, 400 So.2d 705 (La.App. 3d Cir.1981) the action was brought against a physical education instructor, a school board, and the school board's liability insurer for injuries suffered by the plaintiff's son when he ran through a glass panel at school. The plaintiff asserted that the board's failure to use safety glass rendered the panel defective. The plaintiff based his

---

**17.** The distinction *Dorry* drew between a commercial and non-commercial enterprise should not affect Chevron's ability to raise the defenses allowed under *Loescher*. Hyde, the plaintiff, did not pay an admission fee; he received pay for working on the platform. If commerciality is a relevant factor, it is more logical to hold that Pool, rather than Chevron, should suffer the consequences. Pool, the independent (drilling) contractor, the party that principally or

concurrently caused the accident, was in control of the platform for commercial reasons. Chevron, of course, is in business for a profit, but, unlike the skating rink defendant or Pool, could not have prevented the accident. Finally, in any event, the platform was not open to the public to whom the owner (Chevron) or the custodian (Pool) would therefore owe the high duty of care owed by a skating rink proprietor to his patrons.

suit on both negligence (article 2315) and strict liability (article 2317). The court held for the defendant because of the plaintiff's contributory negligence. As to the strict liability claim, the court noted that the relationship between "victim fault" and contributory negligence "has not been clearly enunciated in the jurisprudence", citing *Sullivan*. The court, however, found "compelling" the *Sullivan* conclusions we quoted in the second quotation. It held therefore: "For the same reasons, we conclude that plaintiff's son was guilty not only of contributory negligence but also of 'victim fault' such that the school board is not liable for his injuries under Article 2317". 400 So.2d at 708.

In *Jackson v. Tri-State Elevator Co., Inc.,* 401 So. 538, 543, n. 6 (La.App. 3d Cir.1981) the court referred to *Dorry* and cited *Sullivan* and *Williamson* with approval in equating victim fault with contributory negligence, stating that the "same conclusion can be made under the circumstances of this case". The defendant operated a grain elevator, obviously a commercial enterprise.

*Creamer v. Empire Fire & Marine Ins. Co.,* 405 So.2d 651 (La.App. 3d Cir.1981) was another case involving a skating rink. With reference to the plaintiff's alleged contributory negligence, the court said that if it were deciding whether the strict liability principle of article 2322 applied it would not even consider the question, because of the holding in *Dorry* that the skating rink housed a commercial enterprise. In such a case the plaintiff's contributory negligence would not be a defense to his claim. One judge concurred only in the result, pointing out that the *Dorry* opinion was written by a justice ad hoc and was a plurality opinion.

In *LeBlanc v. State,* 405 So.2d 635, a motorist sued the State Department of Highways for damages sustained as a result of a collision allegedly caused by the defective condition of a highway's shoulder. The Louisiana Court of Appeal for the Third Circuit equated "victim fault" under article 2317 with contributory negligence under article 2315. The court held that "Mrs. LeBlanc's failure to exercise reasonable care

in the operation of her vehicle . . . amounts to victim fault thereby relieving the Department from liability".

In *Stewart v. Sam Wallace Indus. Co.,* 409 So.2d 335 (La.App. 1st Cir.1982) the plaintiff, a construction worker, injured his back by stepping into a fence post hole. He sued the owner, and also the general contractor, alleging, among other bases for the suit, strict liability under article 2317. The Court cited *Sullivan,* among other cases, and decided that "contributory negligence can be equated with 'victim fault' so as to bar recovery under Article 2317".

*Flair v. Bd. of Com'rs of Orleans Levee Bd.,* 411 So.2d 614 (La.App. 4th Cir.1982) was an unusual case. The plaintiff was injured when he drove his automobile off the crown of a levee intentionally constructed with a gap to allow passage of gas transmission lines. The plaintiff alleged that the levee was defective. He sued the Orleans Levee Board under articles 2315 and 2317. The court acknowledged that it was "not at all certain as to what is meant by 'victim fault' ". Nevertheless, quoting from *Dorry,* the court decided that the plaintiff's reckless driving caused his injury, and constitute[d] the "victim fault" referred to in *Loescher v. Parr,* 411 So.2d at 617.

In *Carpenter v. State Farm Fire and Cas. Co.,* 411 So.2d 1206, 1210 (La.App. 4th Cir. 1982) the plaintiff sued the City of New Orleans, a homeowner, and the homeowner's liability insurer, for injuries suffered as a result of a fall while walking on a sidewalk abutting the homeowner's property. The court considered in some depth the question whether contributory negligence is a defense to strict liability, and observed that *until recently* Louisiana courts, *borrowing from the common law,* had held that contributory negligence was not a defense. "Strict liability is imposed because social policy requires that those who profit by engaging in ultrahazardous or abnormally dangerous conditions, and those who create such conditions, or those who engage in the manufacture of products, must pay their way . . . . It is this social policy, rather

than logic which traditionally prevents courts from recognizing contributory negligence as a defense. The illogic of this principle, as Prosser puts it, is that 'the fault of the plaintiff will relieve the defendant of liability when he is negligent, but not when he is innocent. [Prosser, Law of Torts, 4th Ed. (1971) p. 522]. The Louisiana Civil Code sometimes imposes strict liability for conduct which would not necessarily warrant the imposition of strict liability under the common law tradition. Where this is the case, there can be no basis for applying the social policy, borrowed from the common law, which prohibits contributory negligence as a defense. Louisiana has already provided the basis for this conclusion. *Loescher v. Parr,* 324 So.2d 441 (La. 1975), which held for the first time that Art. 2317 'fault' is grounded in strict liability, recognized 'victim fault' as an available defense to liability under that article.... The Louisiana Supreme Court in *Dorry v. Lafleur* ... provide[d] a guiding principle, however, in holding that where the policy considerations which traditionally require the imposition of strict liability are lacking (i.e. where the defendant's conduct concerns neither ultrahazardous activity nor abnormally dangerous activity, nor liability of a manufacturer for its products, nor the realization of a profit for any of these) the resolution of fault must encompass the victim's contributory negligence". 411 So.2d at 1210.

In *Entrevia v. Hood,* 413 So.2d 954, 955 (La.App.1982), involving the collapse of concrete steps, the court accepted without discussion the principle that contributory negligence was a defense to an action based on article 2322, relying on *Dorry, Stewart,* and *Sullivan,* but held that the defendant had not carried the burden of proving contributory negligence.

Another recent case, *Sumner v. Foremost Inc. Co.,* 417 So.2d 1327 (La.App. 3d Cir. 1982), involved faulty steps, an appurtenance to a mobile home. The plaintiff alleged strict liability under articles 2317 and 2322. The court noted that "the relationship between 'victim fault' under LSA–C.C. Article 2317 and 'contributory negligence'

under LSA–C.C. 2315 has never been clearly enunciated in the jurisprudence. The court found that the plaintiff was not negligent but had assumed the risk.

In an opinion rendered the same day as that in *Sumner, Verrett v. Cameron Telephone Co.,* 417 So.2d 1319 (La.App. 3d Cir.) the same court of appeal recognized that "[u]nder what circumstances a plaintiff's contributory negligence does bar his recovery in a strict liability case should be developed on a case-by-case basis", citing *Dorry v. Lafleur,* but observed, "[g]enerally ordinary contributory negligence is not available as a defense in a strict liability action". 417 So.2d at 1326. The court reversed the district court for substituting its judgment for a trial on the merits. "The reasonableness of plaintiff's conduct (or lack thereof) must be viewed in light of the hazard created by the defendant, and such a determination cannot be made, under the circumstances presented on a motion for summary judgment." The court made the statement, "victim fault is usually in the form of assumption of risk." This statement cannot be denied, and there are many cases relieving the defendant of strict liability because of the plaintiff's assumption of risk. The statement is not, however, inconsistent with recognition of contributory negligence as another variety of victim fault. Assumption of risk may be described as *a fortiori* victim fault.

The Supreme Court of Louisiana, in a very recent case, *Kent v. Gulf States Utilities Co.,* 418 So.2d 493 (La.1982), *reh. denied* September 3, 1982, clarified and refined *Loescher v. Parr.* The case turned on whether the defendant had acted unreasonably in failing to protect others against risk of injury from high voltage lines over a road under construction. The doctrinal discussion, however, is relevant to the issue of the defense of contributory negligence in the context of Louisiana strict liability. In *Loescher* the owner-guardian was liable, although not negligent, for maintaining a defective tree and not preventing the thing from causing injury, unless he proved that the damage was caused by the fault of the

victim, by the fault of a third person, or by an irresistable force. In *Kent,* Justice Lemmon, writing for the Court, pointed out that "the term 'thing' encompasses a virtually unlimited range of subject matter". *Id.* at 497. This has led "innumerable litigants" to seek to avoid the necessity of proving defendant's negligence under article 2315 by the expedient of alleging strict liability under articles 2317 or 2322. "The distinction between negligence cases and strict liability cases (such as *Loescher*) has largely been either misunderstood or disregarded. It is therefore appropriate ... to review first the distinguishing effect of applying strict liability." *Id.* In a strict liability case as opposed to a negligence case, "the claimant is relieved only of proving that the owner knew or should have known of the risk involved. The claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm.... *Under strict liability concepts the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody.*" (Emphasis in original.) *Id.* at 497. "Under strict liability concepts the owner was presumed to have knowledge of the tree's condition, and he was liable because a reasonable owner who had discovered the hazardous condition would not have maintained the thing as he did without correcting or minimizing the risk. *As some torts scholars have observed, the test in strict liability cases, except for the element of the defendant's scienter, is virtually the same as that for negligence. See* J. Wade, Strict Tort Liability for Manufacturers, 19 S.W.L.J., 5, 15 (1965), 418 So.2d at 497–98." (Emphasis added). *Id.* at 498.

Justice Marcus, in a brief concurring opinion found ample evidence of "victim fault". "The plaintiff was either contributorily negligent and/or assumed the risk of injury". 418 So.2d 500.

Justice Dennis wrote a concurring opinion that sheds considerable light on the Louisiana concept of strict liability stemming from *Loescher v. Parr.* He was "convinced" that the Court in that case "through the use of the phrase 'unreasonable risk of injury' intended to inject into the theory of liability under Article 2317 [and, of course, Article 2322] a balancing test closely analogous to that utilized in negligence actions". 418 So.2d at 501. He pointed out, "All of these 'unreasonable risk' tests imply a process of balancing the risk against the value of the interest which the defendant is seeking to protect, and the expedience of the course pursued.... This is the standard negligence test. In strict liability, except for the element of the defendant's knowledge, the test is the same as that for negligence.... In the future, we may come to recognize that in the strict liability of *Loescher v. Parr,* except for the element of the knowledge of the custodian of the thing, the test is the same as that for negligence.... [T]his type of strict liability will retain many of the characteristics of negligence law." *Id.* at 501. In the light of this recognition of the negligence component of the owner's-custodians' fault, it is consistent to consider the victim's contributory negligence fault. Then, citing *Dorry,* Justice Dennis concluded that "*Loescher* strict liability bears little analogy to the common law doctrine of strict liability for abnormally dangerous conditions and activities with which it has sometimes been compared.... The *Loescher* doctrine is much broader since it covers all things, everywhere which create an unreasonable risk of injury to others. Most of the circumstances giving rise to strict liability under Article 2317 [and 2322] have been neither ultrahazardous nor unnatural to the locality". *Id.* at 502. As authority, he cited *Dorry* and an influential commentary, Professor Wex Malone's "Ruminations on Liability for the Acts of Things", 42 La.L.Rev. 979 (1982). He had previously cited the comment, Does Louisiana Really Have Strict Liability under Civil Code Articles 2317, 1218, and 2321?, 40 La.L.Rev. 207 (1979). In an important footnote, Justice Dennis noted that the *Loescher* opinion has been "criticized for discarding the traditional test of blameworthiness by imposing liability upon a defendant who had neither actual nor con-

structive knowledge of the defective condition of the thing in his custody", citing Professor Malone's article. He suggested that the "perceived harshness of this result may be ameliorated, to a large degree, if the doctrine of comparative negligence is found to be applicable to article 2317 [and 2322] actions. *See* 1979 La.Ads. No. 431; Plant, Comparative Negligence and Strict Tort Liability, 40 La.L.Rev. 403 (1980)".

As we read the law review commentary it supports or extends the approach of *Dorry,* specifically the recognition that the Louisiana doctrine of strict liability encompasses elements of negligence, at least, in determining the test of the defendant's liability and the victim's fault. Professor Malone reached the "inescapable" conclusion that "no-fault liability for the acts of 'defective' things offers no demonstrable advantage over the familiar negligence approach.... [The] judicial concept of a risk that is unreasonable although it is untainted by any negligence on the part of its guardian is certain to afford difficulty .... [I]n determining whether the injurious thing is defective the court must afford the defendant the opportunity to show that the injury complained of was not caused by the act of the thing, as contended, but was the result of the act of the victim himself, or the act of a third person, or that it was caused by a *force majeure.* This search obliges the court to struggle anew with proximate cause. The unhappy result is that the trier is obliged to select the 'real' or 'substantial' cause of the plaintiff's harm. He must have some mystique to determine when and under what circumstances the victim's own behavior or the act of the third person should be accepted as the responsible cause thus relieving the defendant of liability". Malone, Ruminations on Liability for the Acts of Things, 42 La.L.Rev. 979, 1006–09 (1982).

In a case by case study of strict liability claims predicated on articles 2317 and 2322, the author concluded:

It is submitted that, based on the present jurisprudence in Louisiana, the concept of "victim fault," as used as a defense to a strict liability claim in Louisiana, is a proximate relative to the concept of "contributory negligence." It is further submitted that the standard applied in *Sullivan,* i.e., that ordinary contributory negligence is a defense to a strict liability claim is not only less confusing to apply, but also crucial in light of Louisiana's recently enacted comparative fault codal article.... By following the language appearing in *Sullivan,* Louisiana jurisprudence would permit the application of comparative fault without confusion, uncertainty, and injustice.

We agree with this conclusion. The author added:

It is further contended that recent federal decisions have misinterpreted Louisiana strict liability law. Recent cases such as *Rodrigue, Hyde* [district court decision], and *Alford* incorrectly assert that contributory negligence is not a defense to a strict liability claim, and that only conduct amounting to assumption of risk will relieve the defendant of strict liability under Louisiana law. *This is clearly not the present law in Louisiana.* (Emphasis added.) Such an interpretation demonstrates the inability of federal courts to differentiate between the strict liability in Louisiana and that of other jurisdictions.

Gaudet, The Application of Louisiana's Strict Liability Law on the Outer Continental Shelf: A Quandary for Federal Courts, 28 Loy.L.Rev. 101, 127 (1982).

■ Louisiana has now adopted a comparative fault statute. Acts 1979, No. 431. It amends article 2323 to provide for a reduction in damages "in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss".[18] This case does not come

---

18. The statute amends article 2323 of the Civil Code to read as follows:

Art. 2323. When contributory negligence is applicable to a claim for damages, its effect

shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for

within the terms of the statute, because the amendment was not effective until August 1, 1980.[19] The amended article 2323, however, would seem to apply to the defense of contributory negligence in strict liability cases.[20] Plant, Comparative Negligence and Strict Liability, 40 La.L.Rev. 40, 415 (1980). Turning to policy considerations, Professor Plant concluded:

> [T]here is nothing in the basic strict liability policy that requires that defendant pay all and plaintiff fault be ignored. A similar view is warranted as to parents, owners of animals, and owners or custodians of things. For reasons that have roots deep in the history of the Louisiana Civil Code such persons carry the burden of strict liability; but the *Louisiana courts have repeatedly held that the obligation is not absolute and can be extinguished by plaintiff's negligence.* (Emphasis added.)

*Id.* 417.

 In sum, having reviewed the Louisiana jurisprudence with particular reference to *Dorry,* to the post-*Dorry* decisions, and to law review commentary, we hold that the district court was in error in rejecting the defense of contributory negligence. "Victim fault" encompasses contributory negligence and may be a defense to an action brought under article 2322 of the Louisiana Civil Code, if it is a substantial cause of the injury. This is not to say that "contributory negligence" and "victim fault" are synonymous terms. It is evident from the cases that victim fault encompasses assumption of risk and that it does so in many cases in which the defendant raises defenses of both contributory negligence and assumption of risk. We express no opinion on the question whether in this case the plaintiff's contributory negligence, if any, defeats the plaintiff's cause of actions in the circumstances of this case. That determination must be made in the district court on remand.

## VI.

 We agree with the district court that here there was no voluntary assumption of the risk. The plaintiff was compelled to use the staircase to go to and from his living quarters and there is no evidence that the plaintiff had knowledge of the defective condition of the last step; he was injured on the first day of his tour of duty.

## VII.

 An owner is exculpated from liability under Article 2322, if the cause of the injury is the fault of a third person. We agree with the district court that Chevron is not exculpated on this ground, but *not* for the reason the court gave. The district court stated that Chevron had the responsibility for the supervision of all work that took place on the platform and that Chevron's acquiesence in the modification of the staircase "coupled with the absence of any evidence of any Pool *mishandling* prevents Chevron from shifting the responsibility to Pool". (Emphasis added.)

We are uncertain what the court meant by the term "mishandling". The evidence is overwhelming that the last step of the staircase failed because it was not properly welded to the staircase. *See* Section III of this opinion. The welding was done by Pool's sub-contractor, Wemac, for which Pool, the independent contractor, is liable; the owner is not liable. If the meaning of the finding is that Pool was not negligent or that Pool did not contribute to the accident, the finding was clearly erroneous.

damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.

19. The accident occurred May 10, 1977. The plaintiff filed suit March 6, 1978.

20. "If comparative principles are not allowed to function there will be the paradoxical situation in strict liability areas in which a defend-

ant who admits or is proved to be negligent will be liable for only part of the damages caused to a contributorily negligent plaintiff, whereas a defendant who is entirely innocent and has done his best, albeit unsuccessfully, to avoid causing injury will be liable for all damages including the portion caused by the negligent plaintiff." Plant, Comparative Negligence and Strict Liability, 40 La.L.Rev. 403, 418.

Here, in accordance with usual practice in the offshore oil industry, as the cases reflect, Chevron employed an independent contractor, Pool, to do the drilling and handle all operations on the platform. The object of the contract was to insulate Chevron from liability for injuries constantly occurring to offshore workers employed on drilling platforms. There was no obligation on Chevron to supervise. A principal cannot be held answerable for failing to supervise an independent contractor. *McCormick v. Noble Drilling Corp.,* 5 Cir.1979, 608 F.2d 169, 174–75.

In *Robideaux v. Hebert,* La. 1907, 118 La. 1089, 43 So. 887, 889, the Louisiana Supreme Court established the general rule that a person who hires an independent contractor is not liable for the negligence of that contractor. Recent cases have clarified the rule. In *Cornish v. Ford, Bacon & Davis Construction Corp.,* La.App.1974, 304 So.2d 361, 366, the Louisiana Court of Appeals for the First Circuit stated:

> Under our well established law, an owner is not liable to third parties for the negligent acts of a contractor where the contractor undertakes performance of a work pursuant to a contract in which the owner furnishes plans and specifications, and possesses only the right to insist that the job be performed in accordance with the contract plans and specifications.

*See Cruttie v. Frank,* La.App.1962, 146 So.2d 474, 479–80. Other cases have stated that the rule applies to employees of the independent contractor as well as to other third parties. *Robideaux,* 43 So. at 888–89; *Henson v. Travelers Ins. Co.,* La.App. 1968, 208 So.2d 366, 368. Two cases have relied on the *Robideaux* rule despite possible strict liability of the owner of the premises to the injured party. *Daroca v. Metropolitan Life Ins. Co.,* 5 Cir.1941, 121 F.2d 917, 919; *Tardo v. New Orleans Public Service, Inc.,* La. App.1977, 353 So.2d 409, 413.

As a matter of law, Chevron is strictly liable by reason of its ownership of the injury-producing thing, a matter having nothing to do with Pool's lack of "mishandling" or Chevron's supposed "acquiescence" or "failure to object" to Pool's work or its failure to "supervise Pool". Chevron would be relieved of liability if the injury were caused by the "sole fault" of a "third person". But, as stated in *Olsen v. Shell Oil Co.,* 365 So. at 1293:

> The fault of a "third person" which exonerates a person from his own obligation imposing strict liability as imposed by Articles 2317, 2321 and 2322 is that which is the sole cause of the damage, of the nature of an irresistible and unforeseeable occurrence—i.e., where the damage resulting has no causal relationship whatsoever to the fault of the owner in failing to keep his building in repair, and where the "third person" is a stranger rather than a person acting with the consent of the owner in the performance of the owner's non-delegable duty to keep his building in repair.

If the victim fault here contributed to the injury, Pool's fault was not the "sole [irresistible and unforeseeable] cause of the damage". And Pool was a "person acting with the owner in the performance of the owner's non-delegable duty"; he was no stranger to Chevron.

### VIII.

In his cross-appeal, Hyde argues that the trial court's damage award was too low. To arrive at this conclusion, Hyde questions the trial court's computation of lost future wages, its failure to award separate damages for his permanent disability, and the inadequacy of the compensation for his pain and suffering. We see no merit in these contentions.

At trial, Hyde's expert economist testified that Hyde had a work life expectancy of 26.1 years at the time of trial. Based on this figure, a 6.7 percent inflation and productivity factor, a discount rate of 7.5 percent for the future investment potential of the funds awarded, and the assumption that Hyde would still be able to get a job paying minimum wage, the expert determined that his lost future wages would be $234,444.71, net after taxes. On cross-examination, the expert stated that lost future wages would

amount to $107,087.28 if he used a discount rate of 10 percent and did not consider inflation and productivity gains.

The trial court awarded lost future wages of $100,000. Hyde asserts that the trial court could have arrived at a figure this low only if it failed to take account of inflation and ignored the only available actuarial evidence. We disagree. The court specifically stated that this figure took into consideration a "discount to present value and inflation."

Although only one witness testified at trial regarding the calculation of Hyde's damages, the expert's testimony was not conclusive. Based on the expert's statements during cross-examination, the trial court could have decided that a discount rate greater than 12 percent was more appropriate than 7½ percent.[21] More importantly, the expert's figure was based on the assumption that, considering his injury, Hyde could expect to earn only minimum wages in the future. After hearing testimony regarding Hyde's abilities and physical condition, the court may have determined that Hyde could earn more than the minimum wage rate in the future. Increasing Hyde's expected future earnings by only $1 an hour would decrease the lost future earnings figure by about $52,000, before inflation and present value considerations. In light of the other factors that the trial court may have considered outside the testimony of Hyde's expert, we cannot say that the trial court committed clear error.

We also see no merit in Hyde's contention that he was entitled to compensation for his permanent disability above any award for future lost wages. The cases cited by Hyde hold only that the permanence of a disability should be considered in calculating damages.[22] The trial court properly took into account the estimated duration of Hyde's disability in its future lost wages computation. Had Hyde presented evidence that his disability would cause mental anguish or other damage not covered by the trial court's award for lost wages and future pain and suffering, additional damages might have been warranted. *See Miller v. Thomas,* La.App.1970, 234 So.2d 67, 78. Hyde presented no such evidence.

Finally, Hyde asserts that the trial court's award of $45,000 for past and future pain and suffering was inadequate.

21. The cross-examination of Hyde's expert witness included the following exchange:

Q. Dr. Goodman, isn't it true that you can get a lot more than seven and a half percent in a safe investment such as Government bonds or other securities that will allow you from time to time to take money out, which I'm sure you're trying to do over this man's work life expectancy?
A. No, sir, not if you mean withdrawing principal, because you can never be certain what price you will get for selling off any such securities.
Q. What are Government bonds selling for right now?
A. You mean what are they yielding?
Q. Yes.
A. The longest term bonds are generally yielding between twelve, twelve and a quarter percent today, maybe slightly higher.
Q. What is the term on those time securities?
A. Of course they run for various terms. When they are issued, their maturity is for a maximum amount of thirty years. But they may be redeemed as early as twenty-five years. And on the market, of course, there

are Government securities that have been issued in the past, and, therefore, they have various lengths of time to run.
. . .
Q. Is it not true that money market certificates now backed by the United States Government are selling in order [sic] of 14.8 percent?
A. These are not quite backed by the Government in the sense the Treasury bonds are. They are guaranteed by an agency of the Government. It is true they are yielding about fourteen percent now, but that guarantee is only good for six months.

22. *See Benoit v. Hunt Tool Co..* La.App.1952, 56 So.2d 292; *Hare v. New Amsterdam Casualty Co.,* La.App.1941, 1 So.2d 439. In *Benoit,* the court allowed an award for loss of hearing even though the hearing loss did not interfere with the plaintiff's employment. The court based the award, however, on the disagreeableness of not being able to hear well, and the constant ringing in the plaintiff's ears. Thus, the award resembled the trial court's award for future pain and suffering in this case.

We give a trial court great latitude in awarding damages, *Fenasci v. Travelers Ins. Co.,* 5 Cir. 642 F.2d 986, 989, *cert. denied,* 1981, 454 U.S. 1123, 102 S.Ct. 971, 71 L.Ed.2d 110, especially when damages include an award fee. Any amount to be awarded for pain and suffering must necessarily depend to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation. We do not set aside a trial court's damage award unless it is clearly inadequate. *Drake v. E.I. Dupont de Nemours & Co.,* 5 Cir.1970, 432 F.2d 276, 279. Here, the court held a special hearing on Hyde's motion that the award for pain and suffering was inadequate. We can find no clear inadequacy in the award of damages.[23]

## IX.

 In its third-party complaint Chevron sought indemnity from Pool under the indemnity provisions of the workover agreement. The trial court denied Chevron's claim because "an intention to indemnify an indemnitee against his own negligence will not be *presumed* in the absence of a clear and specific contractual stipulation to that effect". The court reasoned, "It would make no sense to require a specific agreement to indemnify one against his own negligence, and yet *presume* an intent to indemnify one against liability predicated upon an even greater degree of fault, strict liability." (Emphasis added.) 514 F.Supp. at 745.

First, we must point out that the district court overstated Chevron's contention in characterizing it as based on a "presumption". Chevron argued for no presumption. Chevron argued that the parties to the workover agreement *intended* that Chevron be relieved of liability for any injuries to Pool's employees.

Second, the court's reasoning is faulty in that the basis for the general rule of not allowing a party to contract against his own negligence is not applicable to strict liability cases in which the owner-custodian may be non-negligent, non-culpable, and even reasonable and careful in his conduct toward others. The basis for the general principle that one should not be able to contract against his own negligence (absent clear specific language to the contrary) is the state's interest in public safety. This interest rests on the fear that one might be careless of another's life and limb, if there is no penalty for carelessness. Articles 2322 and 2317 impose liability on the owner-custodian not because of negligence but because of the relationship of the owner-custodian to a thing that is unreasonably dangerous to others. The owner-custodian may not even know of the defect or have any reason to think the thing defective, as in *Loescher,* a case involving a rotten tree on the owner's premises. In the case of an owner driving piles on his property causing injury to a neighbor's premises, the owner is strictly liable for damages, even though the owner and the independent contractor may have gone to great pains to avoid any negligence in the pile-driving. Social policy demands that of two innocent parties the risk of injury should fall on the owner or custodian of the injury-producing thing. Usually, this policy produces a fair result. The costs, especially in an industrial accident, will fall on the party best able to afford to pay the damages and the party in control able to prevent injury. The liable party will take steps to prevent accident. That party will insure against the risk and pass the costs on to the general public in whose interest the policy arose. The policy considerations underlying the presumption that a party cannot contract against his own negligence have no application to this case.

The record clearly shows that the substantial cause of the accident was the negli-

23. In his first opinion the trial court's award to Hyde was $175,765.43. This opinion was withdrawn and replaced by another, March 26, 1981 in which the court added $23,155.40 for past medical expenses. After a hearing on a motion to increase the amount awarded for pain and suffering, the court amended the judgment by adding $20,000 to the previous award of $25,000 for pain and suffering.

gence of Pool's subcontractor in the welding of the last step of the staircase (unless it might be said that the plaintiff's slip on the staircase was an equally substantial cause of the accident). Chevron was clearly not the cause of the accident. The platform was in the control and custody of Pool, the independent contractor, and the negligent welding was performed by Pool's subcontractor. Pool was the only party able to prevent the accident. The indemnitee was not negligent; the indemnitor was negligent. Chevron made a legitimate decision to insure against possible liability for any injuries to Pool's employees; Pool must be held to have knowledge of Chevron's strict liability, as a matter of law, for injuries to its employees who were under its control.

Third, the district court's holding ignores the facts of life in the offshore oil drilling industry. The world knows, and this Court well knows, that the offshore oil industry is risky and expensive for the oil and gas companies. It is fraught with danger for the oilworkers who are often exposed to the perils of the sea as well as to the perils of handling oil machinery. As the cases reflect, the oil companies attempt to reduce costs by insulation against damage claims inherent in drilling from offshore platforms. This they do by giving complete control of the drilling operations to independent contractors and by entering into agreements making the drilling contractors, rather than the operators, responsible for damage claims by the oil workers. There is no public policy against this practice, for the contractors in control of the platforms are in the best position to prevent injuries to their crews. The oil companies, drilling contractors, and their insurers in the offshore oil industry are experienced and sophisticated.

Finally and importantly, as we read the workover agreement, the intent of the parties was that Pool, the drilling contractor in charge of operations on the platform, agreed to indemnify Chevron against any claims for injuries to Pool's employees. Before reaching this agreement we reviewed the federal and Louisiana cases involving indemnity agreements. We shall not go through the tedious review that we con-

sidered necessary in discussing contributory negligence as a defense to strict liability. We reached the same conclusion Judge Stagg reached in *Battig v. Hartford Accident and Indemnity Co.,* 482 F.Supp. 338 (W.D.La.1977). After reviewing the authorities including, of course, *Cole v. Chevron Chemical Company,* 5 Cir.1973, 477 F.2d 361, Judge Stagg concluded:

> ... Louisiana does not require a specific reference to negligent acts in order for an indemnity agreement or a release to cover claims based on negligent acts. However, the intention of the parties, as inferred from the language of their agreement, must clearly indicate an intention to include negligent acts without the indemnity agreement or the release.

482 F.Supp. at 343–44.

A basic inconsistency in the trial court's holding is that "the indemnity agreement did not entitle Chevron to be indemnified against its own negligence", but nowhere in the trial court's decision is there any finding that Chevron was negligent. The record shows no evidence of any negligence on the part of Chevron and its liability is based solely on ownership of the platform. We have not been referred to any case, nor have we found any case, in which there is any discussion of the applicability of an indemnity clause to strict liability. The policies underlying strict liability argue for permitting indemnity agreements and we have no reason to assume that the principles of contractual construction would be different in a strict liability case.

> Here the indemnity provision is broad: (7) CONTRACTOR [Pool] shall be responsible for, and shall defend, indemnify and hold OPERATOR [Chevron] harmless from and against, *any claims* for damages for loss or destruction of property of CONTRACTOR, or for *injury to, impairment of health of, or death of employees of CONTRACTOR* or employees of CONTRACTOR'S subcontractors that may arise from CONTRACTOR'S operations under this agreement. If CONTRACTOR obtains insurance to protect itself from loss or destruction of property, CONTRACTOR agrees that any such policy or policies of insurance shall be en-

dorsed to provide a waiver of subrogation rights against OPERATOR. CONTRACTOR shall also be responsible for and shall defend, indemnify and hold OPERATOR harmless from and against, or any claims for damages for loss or destruction of property of third parties that may arise from CONTRACTOR'S operations under this agreement. However, OPERATOR shall have the right, at its option, to participate in the defense of any such suit without relieving CONTRACTOR of any obligation hereunder. (Emphasis added).

Because of Pool's indemnity liability and to be certain that Pool would be able to satisfy its indemnity obligation, Chevron required it to obtain insurance coverage on its employees during the life of the contract. The elaborate insurance obligations Pool undertook in the workover agreement manifest the clear intention of the parties that Pool was to be wholly responsible for all claims for personal injury and death made by its employees.[24] The contract makes numerous references to the insurance for "its [Chevron] protection" with underwriters and in amounts "approved" and "satisfactory" to Chevron. The mandatory endorsements cover much more than simple legal liability imposed on employers under the applicable compensation statutes.

In other cases similar indemnity agreements not including the magic words "negligent acts", the court has allowed indemnity. In *Polozola v. Garlock, Inc.,* 376 So.2d 1009 (La.App. 1st Cir.1979) the indemnity clause was as follows:

Contractor agrees to indemnify and hold harmless Dow, its officers and employees, from and against any and all claims and causes of action and all losses therefrom, arising out of or in any way related to the performance by Contractor of services hereunder, including without limitation any such claims for personal injury or death or property damage or destruction or urged by employees of Dow, employees of Contractor, any sub-contractor, and employees of any sub-contractor of Contractor, or all third parties whomsoever. This indemnity obligation of Contractor shall further extend to and include any and all claims made against Dow by any employees of Contractor, or any sub-contractor or any employee of any sub-contractor, arising from any source while any such party is on premises owned, operated, leased or controlled by Dow. *Id.* at 1014. (Emphasis supplied)

The court rejected the same contention that was made in this case: "the real question posed is that of the intent of the parties, and the intent so to cover has been found even in the absence of the magic words." *Id.* See also *Chaney v. Travelers Insurance Company,* La.1971, 249 So.2d 181; *D'Albora v. Tulane University,* 274 So.2d 825, 831 (La.App. 4th Cir.1973); *Cole v. Chevron Chemical Co.,* 5 Cir.1973, 477 F.2d 361; *Stephens v. Chevron Oil Company,* 5 Cir.1975, 517 F.2d 1123. In *Cole* and *Stephens* the court concluded that indemnity agreements virtually identical with the agreement in this case could allow indemnity when the indemnitee was found to have been strictly liable, as Chevron was in this case.

Here, to have been consistent with its holding as to strict liability, the district

---

**24.** The contract provided:

During the life of this contract, CONTRACTOR [Pool] shall carry the following insurance in connection with its operation hereunder: (a) Workmen's Compensation Insurance, Employer's Liability Insurance, or both, *in OPERATOR'S [Chevron's] opinion required for its protection;* (b) Such other insurance as may be required by law; (c) Public Liability Insurance and Property Damage Insurance; (d) Automobile Public Liability and Property Damage Insurance.

The amount of any such insurance, in excess of the minimum (if any) fixed by law, shall *be such as OPERATOR may consider* adequate for its protection and shall be maintained with insurance companies approved by OPERATOR and legally qualified to write the same.

All policies of insurance mentioned above shall be secured by CONTRACTOR from insurance companies *approved by OPERATOR.* Copies of policies shall be furnished by CONTRACTOR to OPERATOR, and until notified to the contrary by OPERATOR, it shall be deemed that CONTRACTOR has secured such policies from insurance companies and *with limits of liability satisfactory to OPERATOR under this section."* (Emphasis Supplied)

court would have had to hold that the contract contain the magic words "strict liability", a clear and specific statement that Pool agrees to indemnify Chevron for any injuries sustained by Pool's employees for which Chevron might be *strictly liable* under the Louisiana Civil Code. It would not even have been sufficient for the contract to say specifically that Pool agreed to indemnify Chevron for its negligence. As previously emphasized, the court did not find that Chevron was negligent, nor does the record support a possible finding that Chevron was negligent. To put this conclusion in words is enough to demonstrate the district court's faulty construction of the contract.

We hold that the clear intention of parties was that Pool should indemnify Chevron against all claims of Pool's employees, including claims based on strict liability under article 2322 of the Louisiana Civil Code.

\* \* \*

The judgment of the district court on the contributory negligence and indemnity issues is reversed. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.