412 So.2d 128 (1982)
Antonio TIRANTE
v.
GULF STATES UTILITIES COMPANY, et al.
No. 14595.
Court of Appeal of Louisiana, First Circuit.
March 2, 1982.
Rehearing Denied April 13, 1982.
Writ Denied May 17, 1982.
*129 Roger M. Fritchie, H. Evans Scobee, Baton Rouge, for plaintiff-appellant Antonio Tirante.
Ben L. Guelfo, Baton Rouge, for defendant-appellee Fischer Engineering Co.
Boris F. Navratil, Baton Rouge, for defendant-appellee Robert Thibodeaux and Co.
Charles S. McCowan, Michael H. Rubin, Baton Rouge, for defendant-appellant Ciba-Geigy Corporation.
Paul H. Spaht, Baton Rouge, for defendant-appellant White Budd Vanness Partnership.
W. Luther Wilson, Baton Rouge, for defendant-appellee Gulf States Utilities.
Donald S. Zuber, Baton Rouge, for defendant-appellee Hughes-Gano Associates.
Terrance C. McRea, Baton Rouge, for intervenor-appellee Great American Ins. Companies.
Before CHIASSON, EDWARDS and LEAR, JJ.
EDWARDS, Judge.
Plaintiff, Antonio Tirante, brought this action seeking damages for electrical burns which he sustained while working on a construction project.
Antonio Tirante was injured while working on a cooling tower which had been constructed as part of a developmental building project for Ciba-Geigy Corp. at St. Gabriel, Louisiana. Tirante, an apprentice plumber, sustained severe electrical burns when the back of his neck came into contact with an uninsulated electrical line carrying 7,280 volts. The line was owned, operated and maintained by Gulf States Utilities Company. Tirante testified at trial that he had no recollection of the events surrounding his accident. No one witnessed plaintiff's accident. Tirante was an employee of Bernard Mechanical Contractors, a subcontractor of Robert Thibodeaux and Co., Inc., general contractor on the project.
Made defendants in plaintiff's action were the following: Ciba-Geigy Chemical Corp. ("Ciba-Geigy"), the owner of the building; Gulf States Utilities Company ("GSU"), the owner and operator of the electric line; Robert Thibodeaux and Co., Inc. ("Thibodeaux"), the general contractor; Frank P. Fischer Engineering Co., Inc. ("Fischer"), a consulting engineering firm on the project; and White, Budd, Van Ness Partnership ("White"), the architect on the project.
Thibodeaux was granted a summary judgment dismissing plaintiff's demand on the basis of a "statutory employer" defense. See LSA-R.S. 23:1061. Great American Insurance Co., the workmen's compensation insurer of plaintiff's employer, Bernard, intervened *130 in the action, seeking recovery of $16,921.89 in workmen's compensation benefits paid to Tirante. The remaining defendants answered plaintiff's petition, denying any negligence on their part and asserting plaintiff's contributory negligence and assumption of the risk as special defenses.
Additionally, a number of third party demands were filed: Ciba-Geigy filed a third party demand against Thibodeaux, seeking contractual and tort indemnity and asserting breach of contract. Ciba-Geigy filed a similar third party demand against the architects and filed general tort indemnity and contribution demands against the other defendants. Thibodeaux's insurers, the American Insurance Company and Firemens Fund Insurance Company were also added as third party defendants. White filed a third party demand similar to Ciba-Geigy's general indemnity contribution claim. White also filed a third party demand against Hughes, Gano and Associates, Inc., the consulting electrical engineers on the project.
A jury trial commenced on Monday, February 2, 1981. At the close of plaintiff's case all defendants moved for a directed verdict on the main demand. The trial court granted the motion for directed verdict in favor of all defendants. Plaintiff has appealed that ruling.[1]
On Monday, February 9, 1981, the trial of the contractual indemnity portion of Ciba-Geigy's and White's third party demands against Thibodeaux was resumed. The trial court rendered judgment in favor of Thibodeaux on these third party demands. By agreement of counsel, Ciba-Geigy's third party demands against Thibodeaux and White for tort contribution or damages for breach of contract, as well as any other third party demands for tort contributions or damages due to breach of contract, were deemed moot by the trial court and reserved in the event that the case was remanded.
Tirante and Great American have appealed the trial court's judgment for defendants on the main demand. Additionally, White and Ciba-Geigy have appealed the dismissal of their contractual indemnity claims against Thibodeaux.

MAIN DEMAND
As previously mentioned, the trial court granted defendants motion for a directed verdict and dismissed plaintiff's action. Directed verdicts are authorized in civil jury trials by LSA-C.C.P. art. 1810, which provides in pertinent part, as follows:
"A. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury."
The standard for granting a directed verdict was set forth in Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir. 1979):
"Moreover, since the source of LSA-C. C.P. article 1810A is the Federal Rules of Civil Procedure, we believe that the correct standard is that applied in the Federal Courts. See Madison v. Travelers Insurance Company, 308 So.2d 784 (La. 1975). This standard is succinctly stated in the following language penned by the U. S. Fifth Circuit Court of Appeal in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969):
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which *131 supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." 373 So.2d 237, 239; See also Grimes v. Stander, 394 So.2d 1332 (La.App. 1st Cir. 1981).
The trial judge gave oral reasons for granting the directed verdict. The trial judge assumed, for purposes of the motion only, that all of the defendants were guilty of some fault that caused or contributed to the accident. He also recognized that there was the possibility of liability under LSA-C.C. art. 2317, so-called "strict liability" as well as under LSA-C.C. art. 2315, based on negligence. However, the trial court concluded that the evidence adduced established such strong proof of contributory negligence and victim fault that reasonable men could not arrive at a verdict in favor of plaintiff. We conclude that the trial court erred in this determination and in granting the directed verdict.
Because the trial judge based his decision on a finding of victim fault, he did not reach the issue of defendants' fault in causing the accident. Our review of the record leads us to conclude that the evidence, when viewed in a light most favorable to the plaintiff, would allow reasonable men to conclude that any or all defendants caused plaintiff's injury by virtue of substandard conduct. A review of the evidence presented establishes the potential liability of each defendant.
The electric line, carrying 7,280 volts, was installed several years before the cooling tower was constructed. At the time of the accident its sole purpose was to provide electricity to a house trailer used by Ciba-Geigy for refilling and storing fire extinguishers. The cooling tower was constructed directly beneath the line. The line was a mere 6'4¼" above the top of the tower. There were pipes, valves and cooling fans located at the top of the tower which occasionally required the attention of workmen, such as plaintiff. The wire was suspended 5'3½" above these pipes. The proximity of the electric lines violated the minimum clearance requirement of the National Electrical Safety Code.
Samuel Schexnailder, Ciba-Geigy's business manager, admitted that the slab for the cooling tower had been present under the line for quite a while. He conceded that one could have seen that the cooling tower would be directly under the line when constructed. Keith Conrad, project engineer for Ciba-Geigy, admitted that he saw the tower being built under the line and conceded that it was a hazard. Walter Newman, construction superintendent for Thibodeaux on the project, testified that he was aware of the line running over the cooling tower as soon as the building was laid out. Newman testified that he then asked Keith Conrad to have the line moved, but Conrad refused.
GSU installed the power line several years before the cooling tower was built. However, GSU repair crews twice worked on the transformer which served the Thibodeaux construction shack without noticing the tower under the line. The transformer was connected to the line in question. Vernon Acaldo, a meter reader for GSU, read the meter at Thibodeaux's construction shack every month but failed to notice the proximity of the line to the tower. Gulf States stipulated that the distance between the line and tower did not meet the minimum clearance requirement of the National Electrical Safety Code. All GSU employees admitted that their employment duties included the duty to look for and note possible electrical hazards.
The White, Budd, Van Ness Partnership had been furnished by Ciba-Geigy with a *132 drawing showing the location of the electrical line prior to their planning of the building's location. James Budd visited the jobsite ten times or more and additional visits were made by Carl Hoffpauir on a regular basis. Budd admitted that the line constituted a hazard, but that he never noticed it over the tower. Budd further conceded that it was one of his firm's duties to inspect and supervise the construction project. Finally, Budd admitted that if he had become aware of the line, he would have requested its relocation, insulation or de-energization.
The trial court concluded that plaintiff would not be entitled to recover because of his own fault. We do not believe that the evidence, construed in a light most favorable to plaintiff, justifies such a conclusion.
Tirante was an apprentice plumber who had previously been on top of the tower five to ten times. On the day of his accident, he was sent by his foreman, John Clark,[2] to adjust some valves located on the roof of the tower. Plaintiff has no recollection of any of the events surrounding his accident. Furthermore, no one witnessed his mishap on the top of the cooling tower. Plaintiff was discovered lying on the roof of the tower, having suffered severe electrical burns to the back of his neck and other parts of his body.
The testimony at trial and the exhibits filed in the record revealed the following information about the physical layout of the cooling tower: There are two large fans located on the roof of the tower. A 10" diameter pipe extends up the side of the tower from the slab to the roof. This pipe runs across the top of the roof on one side of the fans and is connected to each fan. The valve which plaintiff was sent to adjust is located in this pipe several feet from one of these fans. The pipe is suspended several inches off of the top of the roof. The roof of the tower consists of a decking material called "transite." There is a wooden walkway on the opposite side of the fans from the pipe. This walkway extends from a ladder which provides access to the tower to the other side of the roof. The section of pipe containing the valve which plaintiff was sent to adjust is located several feet from the end of the walkway, and is suspended over transite decking material.
Hair from Tirante's head was found on the electric line at a spot located directly over the pipe on the cooling tower roof. This was established to be the point at which the back of plaintiff's neck came into contact with the wire. This point of contact with the wire was located approximately three feet from the valve which plaintiff was sent to work on. There is no wooden walkway around the pipe in that area. At that point, the electric line is 6'4¼" above the transite decking, but only 5'3½" above the top of the pipe.
The trial court based its finding of victim fault on its conclusion that Tirante voluntarily and unnecessarily exposed himself to the danger. Tirante admitted at trial that he had been warned and was aware of the proximity of the line and that the line was "hot." Since Tirante is about 5'10" tall, the trial court concluded, correctly, that he must have been standing on the pipe when the back of his neck touched the line. Such action (standing on the pipe) constituted victim fault, the trial judge reasoned, because if Tirante had worked at floor level, "there would have been no exposure to any danger."
The trial court's conclusion that Tirante was unnecessarily standing on the pipe is not supported when the evidence is examined under the standard applied to directed verdicts. Tirante testified at trial that he did not know that the transite decking could be walked on.[3] This testimony was uncontradicted. There is no wooden walkway in the area where Tirante was injured. Additionally, Tirante testified that he had *133 always seen his foreman, Clark, adjust the valve by standing on the pipe and kicking the valve loose. Finally, we note that Tirante apparently came into contact with the wire while standing on the pipe at a point about three feet in distance from the valve on which he was working.
Our review of the evidence contained in the record, viewed in a light most favorable to plaintiff, brings us to the conclusion that reasonable men could conclude that Tirante did not voluntarily and unnecessarily expose himself to the danger of contacting the electric line.
It is well established in our jurisprudence that contributory negligence is never presumed, but must be proved as any other fact by a preponderance of the evidence. Harper v. New Orleans Public Service, Inc., 300 So.2d 546 (La.App. 4th Cir. 1974); Layne v. Louisiana Power and Light Co., 161 So. 29 (La.App. 2nd Cir. 1935). It is equally well established that when a person is in the presence of a known danger, it must be shown that the plaintiff voluntarily and unnecessarily exposes himself to that danger. Harper v. New Orleans Public Service, Inc., supra; Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955).
Even though a workman may be aware of the existence of an electrical power line, it is not an assumption of the risk per se, nor is it negligence per se, to work in close proximity to those lines. Dyson v. Gulf Modular Corp., 338 So.2d 1385 (La. 1976); Harper v. New Orleans Public Service, Inc., supra; O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir. 1973); Barrois v. Service Drayage Co., 250 So.2d 135 (La.App. 4th Cir. 1971). As Judge Redmann of the 4th Circuit has observed:
"... a workman's superior cannot create or permit danger and send the workman into it with a warning and escape liability on a theory that the workman was contributorily negligent merely by going into the danger. The workman's only other alternatives are to try to tell his superior how to run the job, or to quit." Chaney v. Brupbacher, 242 So.2d 627, at 631 (La.App. 4th Cir. 1970.)
Based upon the evidence presented, viewed in a light most favorable to plaintiff, reasonable men could have concluded that he did not voluntarily and unnecessarily expose himself to the danger of contacting the electric line. The evidence could support a conclusion that plaintiff thought it was necessary to stand on the pipe in order to perform his assigned task. The distance from the location where he was injured to the valve he was working on (about three feet) is not so great as to require a finding that reasonable men could not conclude that his presence in that location was related to his assigned task.
In light of our finding that the trial court erred in granting the motion for directed verdict, we reverse that judgment as to all defendants but one. The granting of the directed verdict with respect to Fischer Engineering Co. is affirmed.[4]

THIRD PARTY DEMANDS
The trial court dismissed the third party demands of Ciba-Geigy and White which sought contractual indemnity from Thibodeaux. After a thorough review of the record, we conclude that the trial court correctly decided that issue both legally and factually. His written reasons for judgment, which we adopt as our own, are set out in an appendix to this opinion.
For the foregoing reasons, the judgment of the trial court, granting the directed verdict on the main demand and dismissing plaintiff's action, is reversed with respect to all defendants except Fischer Engineering Co. That portion of the judgment dismissing plaintiff's demand against Fischer is affirmed. Furthermore, the trial court's judgment, dismissing Ciba-Geigy's and White's third party demands for contractual indemnity, is affirmed. The case is remanded to the district court for further proceedings consistent with the reasons expressed herein. Costs of this appeal are assessed against defendants-appellees.
*134 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

APPENDIX
ANTONIO TIRANTE NUMBER 209,149 DIVISION D
 19TH JUDICIAL DISTRICT
 COURT
VS.
 PARISH OF EAST BATON
 ROUGE
GULF STATES UTILITIES
COMPANY, ET AL. STATE OF LOUISIANA

WRITTEN REASONS FOR JUDGMENT
For oral reasons previously assigned, which are by reference made a part of these reasons, the court granted directed verdicts of dismissal as to all defendants on the main demand after completion of the plaintiff's case.
The third party demands of Ciba-Geigy Corporation (Ciba) and the White Budd Van Ness (Budd) partnership remain and must be resolved.
In its bid proposal for Phase 2 Construction (CG6), Robert Thibodeaux & Company offered to construct Ciba's Development Building as per drawings and specifications in Bid 838 (CG3) for a base bid of $2,428,700.00. Ciba recommended that said proposal be accepted (CG5). On July 20, 1976, Thibodeaux and Ciba executed Purchase Order No. CA 26782 (CG7) wherein Ciba's acceptance of Thibodeaux's offer was reduced to writing, and Thibodeaux bound itself to "CONSTRUCT DEVELOPMENT BLDG. AS SPECIFIED IN BID NO. 838."
With that acceptance a contract arose (C.C. Art. 1803). Since a formal agreement as contemplated in the bid documents was never executed, the contract between the parties consisted of the offer and acceptance as indicated above.
The indemnity provision sought to be enforced in this third party claim is found within the documents provided in Bid 838 (CG3). Third party plaintiffs (Ciba and Budd) argue that the indemnification clause of Paragraph 4.18.1 of the General Conditions found in Bid 838 is binding and enforceable against Thibodeaux. This clause reads as follows:
4.18 INDEMNIFICATION
4.18.1 The contractor shall indemnify and hold harmless the Owner and the Architect and their agents and employees from and against all claims, damages, losses and expenses including attorneys' fees arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder.
Another hold harmless clause appears in the Supplementary General Conditions added to the standard contract language by Ciba. It reads as follows:
16. GENERAL RESPONSIBILITIES OF THE CONTRACTOR:
* * * * * *
D. The Contractor shall save harmless the Owner and the Architect from all suits, actions or claims brought on account of any injuries or damage sustained by any person or property in consequence of any neglect in safeguarding the work by the Contractor, or on account of any claims or amount recovered for any infringement of patent, trademark or copyright, or from any claims or amounts arising or recovered under the "Workmen's Compensation Law" or any other laws. He shall be responsible for all damage or injury to property of any character occurring during the prosecution of the work resulting from any act, omission, neglect or misconduct on his part or on the part of his employees, his subcontractors, and (sic) their employees, in the manner or method of executing the work; or from his failure to execute the work properly; or from defective work or materials. He shall not be released from such responsibility until all claims have *135 been settled and suitable evidence to that effect furnished to the Architect.
Ciba and Budd argue that both provisions are binding on Thibodeaux; that Paragraph 16D supplements rather than replaces Paragraph 4.18.1; and that Paragraph 4.18.1 required Thibodeaux to indemnify their expenses in defending the main demand. It should be noted that Paragraph 16D does not require Thibodeaux to indemnify Ciba or Budd against claims caused by their own negligence.
Having found that a written contract arose with the execution of the Purchase Order, the issue is whether the indemnification clause in Paragraph 4.18.1 is a part of that contract. The court finds that Paragraph 16D of the supplemental conditions created an ambiguity in the contract. Supplementary General Conditions Paragraph 1B states in pertinent part:
"In addition, the provisions of the AIA General Conditions are specifically amended as follows: * * *."
Fifteen pages of amendments follow, some of which are specific additions to the General Conditions. Paragraph 16 is entitled, "General Responsibilities of the Contractor." Paragraph 16D has been set forth above and clearly the contractor's obligations therein are not as onerous as under Paragraph 4.18.1 because the requirement to indemnify for owner negligence language does not appear. Supplementary, as commonly defined, means additionally. Nothing additional is required of the contractor in Paragraph 16D. Instead, 16D reduces the contractor's obligations and seems to replace in toto the corresponding provisions in the General Conditions.
Under Louisiana law, any ambiguity must be resolved against the drafter of a document. The application of that well settled rule here results in the conclusion that Ciba and Budd were unclear as to whether Paragraph 16D was to supplement and amend or replace Paragraph 4.18.1. Also, the general rule of law concerning indemnity agreements is that same will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts where such intention is not expressed in unequivocal terms. See Arnold v. Stupp, 205 So.2d 797 (1st Cir. 1967) and Polozola v. Garlock, 343 So.2d 1000 (La.1977). The ambiguity resulting from the supplemental general conditions when applied to the General Conditions makes it apparent Thibodeaux did not express an unequivocal intention to be bound by Paragraph 4.18.1 when it executed the purchase order (CG7).
For the reasons cited above, judgment is rendered dismissing the third party demands and will be signed accordingly.
All costs of the main demand, including the expert witness fees for Dr. Lionel Smith, $200.00; Dr. Martin Bell, $275.00; Dr. Howard Kisner, $100.00; Dr. Leonard Adams, $150.00; and Dr. Jan Duggar, $150.00; are taxed to the plaintiff. All costs of the third party demand are taxed to Ciba and Budd.
NOTES
[1] Plaintiff did not oppose the motion for directed verdict made on behalf of Frank P. Fischer Engineering Co., Inc. On appeal, plaintiff assigned error to the granting of a directed verdict only with regard to Ciba-Geigy, GSU and White. Therefore, the granting of the directed verdict with respect to Fischer is not an issue in this appeal.
[2] John Clark was deceased at the time of trial and was, therefore, unavailable to testify.
[3] Tirante's belief that the transite decking could not be walked on appears reasonable in light of the fact that a wooden walkway had been installed in certain areas of the cooling tower roof.
[4] See footnote 1, supra.